2001 WY 137

**Kerry Preston SEID, Appellant (Defendant),**

v.

**Valerie Lynne SEID, Appellee (Plaintiff).**

No. 01–17.

Supreme Court of Wyoming.

Dec. 31, 2001.

---

Sue Davidson of Aspen Ridge Law Offices, P.C., Cheyenne, WY, Representing Appellant.

Mark A. Bishop of Bishop Law Offices, Cheyenne, WY, Representing Appellee.

Before LEHMAN, C.J., and GOLDEN, HILL, KITE, and VOIGT, JJ.

HILL, Justice.

[¶ 1] Appellant, Kerry Preston Seid (hereafter Father), seeks review of an October 15, 1999 order of the district court, which held him to be in contempt of the district court's March 4, 1993 order establishing child custody in this divorce case. Father contends that a portion of the district court's judgment and order must be reversed and remanded to the district court for proceedings before another judge because of an alleged ex parte contact between Appellee's counsel and the district court. Appellee, Valerie Lynne Seid (nka Valerie Otto) (hereafter Mother), rejoins, asserting that the appeal should be dismissed because Father is in violation of several of the Wyoming Rules of Appellate Procedure, and that the ex parte contact, if any, did not result in a manifest injustice to Father. Mother also seeks the imposition of sanctions against Father under W.R.A.P. 1.03 and 10.05. We will affirm.

## ISSUES

[¶ 2] Father raises these issues:

I. Was there manifest injustice which resulted to Father as a result of Mother's attorney's ex parte communication to the trial court?

II. Did the trial judge engage in conduct which would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired?

Mother contends these are the appropriate issues:

I. Whether Appellant's appeal should be dismissed for failing to comply with the Wyoming Rules of Appellate Procedure.

II. Whether Appellant's appeal should be dismissed because a manifest injustice did not occur as a result of the alleged ex parte communication and Appellant was not substantially injured or prejudiced as a result of the communication.

III. Whether penalties should be assessed against Appellant's counsel in the form of attorney's fees and costs incurred in connection with this appeal because Appellant failed to comply with the Wyoming Rules of Appellate Procedure.

IV. Whether penalties should be assessed against Appellant's counsel in the form of attorneys' fees and costs incurred in connection with this appeal because Appellant had no reasonable grounds for this appeal and therefore the appeal is frivolous.

## FACTS

[¶ 3] In a decree of divorce entered on March 4, 1993, the parties' marriage was dissolved, and Mother was awarded custody of their daughter, Aurora, as well as their son, Christopher. During the years 1993 through 1999, the parents made informal "modifications" to the custody and visitation arrangements established by the district court in 1993. Neither parent ever sought a formal modification of the custody and visitation arrangements, and neither parent ever found it necessary to invoke the aid of the district court in resolving their differences over custody or visitation. This was so even though Mother moved to Montana shortly after the divorce was final, and the parents eventually agreed that Christopher should be in the custody of Father, without need for intervention by the courts.

[¶ 4] On August 10, 1999, Father filed a petition to modify the custody and support provisions of the 1993 divorce decree. In that petition, Father alleged that there was an "emergency" which justified an immediate change in custody of Aurora from Mother to Father. The record does not reflect that there had been any animosity between the parents over custody or visitation, up to and

including the time that the petition to modify was filed. On August 13, 1999, Father filed a motion to peremptorily disqualify District Judge Nicholas G. Kalokathis, who had presided over the original divorce proceedings. The record on appeal does not disclose exactly how that motion was resolved, though, of course, Judge Kalokathis did continue to preside over all proceedings in this case. On September 2, 1999, Mother filed a motion for order to show cause why Father should not be held in contempt of the district court. That motion was premised on the circumstance that, on August 9, 1999, Father had failed to abide by the custody provisions of the divorce decree by refusing to return 12 year old[1] Aurora to the custody of Mother. On October 1, 1999, Father renewed his peremptory challenge to Judge Kalokathis and demanded that the matter be heard by a district judge and not the court commissioner. The court commissioner transferred all matters pending in this case back to the district court by order entered on October 12, 1999. On October 14, 1999, the district court entered an order appointing a guardian ad litem for Aurora and instructing that guardian to arrange for the services of a licensed psychologist for Aurora but not to allow continued counseling with a social worker named Jerry Penny.

[¶ 5] On October 15, 1999, the district court entered an order holding Father to be in contempt of court for "refusing to abide by the custody and visitation terms of the Decree of Divorce." As the apparent punishment for his contempt, judgment was entered against Father in the amount of $2,500.00 (representing attorney's fees incurred by Mother). Although it is not clear from the order, the judgment appears to be in favor of Mother, rather than Mother's attorney. On its face, it appears that only Mother's attorney received a copy of that order. The final paragraph of the contempt order[2] follows:

IT IS FURTHER ORDERED THAT Plaintiff [Mother] shall be entitled to the 1999 Thanksgiving and Christmas holiday visitation with both of the minor children

and that Defendant [Father] shall further be entitled to all additional visitation for the non-custodial parent as set forth in the Standard Visitation Order attached hereto as Exhibit "A" and incorporated herein by this reference. Defendant shall be responsible for one hundred per cent (100%) of the transportation costs associated with Plaintiff's visitation until further order of the court.

[¶ 6] By agreement between Mother and Father, Father had actual custody of Christopher since 1997. Father had continued to reside in Cheyenne after the divorce. Shortly after the divorce, Mother had moved to Montana and married Bill Otto (Otto). In July of 1997, Christopher was "sent" to live with his Father by Mother because Christopher was unable to get along with Otto and because Otto had physically abused Christopher to the extent that he was bruised and bloodied. Neither Mother nor Father initiated proceedings to modify the district court's 1993 custody order at that time. In August of 1999, Aurora begged her Father not to send her back to Montana because she feared Otto.

[¶ 7] On October 20, 1999, Father filed an objection to the district court's October 15, 1999 contempt order based upon the fact that it was done on an ex parte basis, as well as without a proper hearing. In an October 25, 1999 order, the district court awarded temporary custody of Aurora to Father. That order also provided: "Sanctions have been imposed against Defendant and in favor of Defendant [*sic* ] for Plaintiff's attorney fees and costs." Further developments helped to clarify what was, at this point, a procedurally muddled situation. The district court had only conducted an emergency hearing on the matter of the custody of Aurora and had not heard evidence with respect to the punishment for the contempt citation, permanent custody, visitation, or any of the other matters purported to be resolved in the district court's October 15, 1999 order. Indeed, it is the manner in which that October 15, 1999 order came to be considered and signed by

---

1. Aurora was born on August 27, 1986, and was just a few weeks shy of being 13 years old.

2. The order was prepared by Mother's attorney.

the district court that forms the centerpiece of the controversy which is brought before this Court. On December 16, 1999, Father filed an amended objection to the October 15, 1999 order, as well as a motion for sanctions against Mother's attorney because of an apparent ex parte communication between the district court and Mother's attorney. By order entered on April 14, 2000, the district court denied all of Father's pending motions. By order entered on October 6, 2000, both children were placed in the "primary residential custody" of Father, subject to Mother's right of visitation, and other issues, such as support and support arrearages, were resolved. Father's appeal was taken from that order, and the notice of appeal filed on November 6, 2000, recited all orders entered by the district court in the interim between August 10, 1999, and October 6, 2000.

[¶ 8] The record on appeal in this case also included two transcripts of hearings, and we will summarize the contents of those transcripts below. The first stage of the hearing in the district court was directed only to whether or not an emergency existed that justified an immediate change in custody of Aurora from Mother to Father. The record of that hearing indicates a tenor which may have made it difficult for evidence to be presented detailing the best interests of Aurora. For instance, when Father attempted to testify about the facts and circumstances that led him to keep his daughter in Cheyenne in early August of 1999, and then file a petition to modify custody, the district court sustained objections to "hearsay" when Father tried to tell the district court what Aurora and Christopher had conveyed to him. Eventually, the district court relented somewhat, thus allowing relevant and admissible evidence to be heard and recorded by the reporter, but with this comment:

> THE COURT: I'll let it in for the limited purpose of knowing, of establishing that this individual [Father] had knowledge that there were problems [relating to Aurora]. It really. [*sic*] Works against him. And, therefore, it destroys any concept of that of an emergency. Hell, he knew about this years ago. Excuse me, my expression. He knew about this years ago. Why didn't he do anything about it?

The first several dozen pages of the transcript suggest that before the hearing began, the district court may have made up its mind that Father was to be held in contempt of court, and the evidence was not going to make any difference with respect to that determination. Indeed, the district court seemed to indicate that it was not particularly interested in hearing evidence as to the best interests of Aurora, but only evidence that went to whether Father had willfully disobeyed the 1993 custody order. Once permitted to testify, Father stated that, during the summer of 1999, Aurora began expressing an especially strong desire that she not have to return to live with her Mother in Montana. However, Father initially did not view that as an "emergency" problem because Aurora had expressed such sentiments for as long as Mother had lived in Montana. During the summer of 1999, Father contacted a lawyer and then sent Aurora to counseling because of the intensity of her desire not to return to Montana based upon her fear of Otto. It was only when Mother showed up unexpectedly to get Aurora in early August of 1999 that Father had to make a hasty decision to honor Aurora's fervent desire not to return to the angst of living with her Mother and Otto. The district court became impatient with the pace of the proceedings and decided to talk with Aurora in chambers. Aurora then related to the court how her fear of Otto had grown as she witnessed violent attacks by Otto on her brother Christopher, as well as on her Mother. Her fear escalated further when Otto began being abusive in his discipline of her. Although the district court tried to convince Aurora that she should return to Montana with her Mother and Otto, Aurora summarized her previous testimony with the sentence, "I don't want to live with them." During the summer of 1999, Father arranged for Aurora to see a counselor, and that individual, Jerry Penny, testified about his observations of Aurora. The district court conducted the direct examination of Penny. After a series of pointed questions and terse answers, it was evident to the district court that Aurora should not be required to return to Montana with Mother and Otto:

THE COURT: Thank you, Mr. Penny. Step down. Let me tell you what I'm going to do at this point, counsel. I'm persuaded this young lady is miserable. And her degree of misery is so pronounced that I don't even think I need the expert to tell me that. But, you know, he reinforced my feeling after talking to this young lady. I think that the father in the case, the proponent, has made a prima facie showing. Therefore, I don't need to hear any more from his side.

But I will give the mother a chance to rebut what I think is important in this case, and that is the well-being of this child. Unless you can convince me that this girl would be happy by being returned to Montana, that somehow it is counterproductive to keep her here, I am inclined to grant the petition.

[¶ 9] The district court then shifted the burden to Mother to dissuade the district court from its tentative decision. Mother did present her evidence, including testimony from Otto. Mother was permitted to testify narratively, without significant interruption from the district court or counsel. She attempted to paint a picture of a very happy family household in rural Montana that stood in stark contrast to the information related to the district court by the children. At that point, the district court assumed responsibility for the questioning of Mother and challenged her rosy view of Aurora's circumstances and opinion that Aurora's testimony was the result of duress from Father, Christopher, and Mr. Penny.

[¶ 10] At the conclusion of all testimony, the district court ruled that there was no emergency that justified the Father in violating the custody order, although the district court did opine that he did not think Father had done anything wrong. The district court also indicated that he would take up the matter of the contempt citation at another hearing, and that he wanted to concentrate on solving the custody issue as the hearing drew to a close. The district court took the matter under advisement. After a period of hours, he returned and rendered an interim decision:

THE COURT: After careful consideration of the file in this case and all of the facts, what I did, I balanced three competing values. The first value is the public policy of sanctioning a father's conduct in withholding custody from the mother. And he could have come into Court and done this thing more orderly.

The second value I put in the equation is the Mother's concern, as she expressed here today, that the relationship between the mother and daughter will be irretrievably damaged. And her allegation is that it has been damaged substantially by Mr. Penny's conduct in this case.

The third component that I look at is the child. Of course, that component is paramount to the other two. The child is in school here. She's expressed some reservations about going back to Montana because of her relationship with her stepfather. Whether that's real, feigned, or unjustified, I don't know.

The Mother's position is that she would like the child up in Montana now so that they could get to the bottom of this thing through counseling. And, of course, there is merit to that. However, I think that the interests of the child compel me to grant temporary custody to the father.

At the same time, I'm going to appoint a guardian ad litem for this young girl, because I'm only granting temporary custody.

The third component in order to vindicate the public policy consideration here that the Court shouldn't stand by idly without consequences for people who willfully violate their orders, I'm going to hold the father in contempt. And I'm going to impose sanctions in the form of requiring him to pay reasonable attorney fees and costs and expenses[3] for the two, for the stepfather and the mother, to come down and attend these hearings. The exact amount of those sanctions will be deter-

---

3. At the close of the first part of the hearing, Mother's counsel indicated that Mother had spent "a thousand dollars getting this thing resolved."

mined by further court order after Mr. Bishop files a statement of costs.[4]

Ms. Davidson, you'll prepare the temporary order, an interim order. We'll set this matter down for further hearings, possibly at the close of the first semester here; and I can hear further evidence on this matter. The parties will give me a call tomorrow with their recommendations as to who the guardian ad litem should be, and we'll go from there. We'll stand adjourned.

MR. BISHOP: Judge, who will pay for the guardian ad litem? Would it make sense—

THE COURT: That would be a determination after you call me. Thank you.

[1] [¶ 11] The central issue in this case arises because the district court not only entered the interim custody order in favor of Father, but also entered a second order (the October 15, 1999 order)—the one proffered by Mother's attorney—resolving the reasonableness of attorney's fees, as well as other matters, without further hearing or the presentation of evidence. The district court also entered an October 13, 1999 order banning Jerry Penny from being a counselor for Aurora. At the hearing held on February 3, 2000, Father's concern about the alleged ex parte communication was addressed. Father contended that the letter accompanying the October 15, 1999 order, as well as the order itself, amounted to an ex parte communication between the district court and Mother's counsel. The letter in question contained this information:

I have enclosed a summary of attorney fees and expenses incurred by Valerie Otto in connection with the Contempt Motion filed against Mr. Seid for violating the current custody order. I have also enclosed a proposed order holding Mr. Seid in contempt of Court. I have left the dollar amount blank as to the amount of fees and costs to be awarded.

You asked counsel for input as to who you should appoint as Guardian ad Litem. I feel that Mary Parsons would be a good choice for Guardian ad Litem.

I feel quite strongly that your order appointing the Guardian ad Litem should provide that Mr. Seid should be responsible for 100% of the Guardian ad Litem fees plus all counseling fees which may be incurred for Aurora while this matter is pending. Mr. Seid has created the current situation by failing to abide by the court's custody order. If he would have handled this matter differently most of these additional expenses would not have been necessary.

I have been informed that Mr. Jerry Penny is not licensed with the State of Wyoming and I feel that your order should prohibit Mr. Seid from taking Aurora to Mr. Penny. The Guardian ad Litem will be responsible for making sure that Aurora sees a competent and qualified psychologist to address the issues raised during the Contempt hearing.

You mentioned at the conclusion of the hearing that Mrs. Otto should have the Thanksgiving and Christmas vacations in light of Mr. Seid's actions in depriving Mom her time with the children. Mr. Seid has consistently ignored his obligations regarding visitation and he has insisted that Valerie Otto bear 100% of the transportation cost associated with transporting the children between Wyoming and Montana. I have included a paragraph in my proposed order establishing visitation while this matter is pending.

[¶ 12] At the February 3, 2000 hearing, the district court stated that it had not seen the offending letter, that it had been detached from the proposed order by his secretary, and that he had no idea what the content of the letter was. Of course, the transcript of the previous hearing bears out that the district court solicited telephonic suggestions as to the name of a guardian ad litem. However, the February 3, 2000 transcript establishes that neither attorney was able to complete telephonic communication with the district court. After several minutes of discussion between Father's attorney and the district court, the district court relented and admitted it had erred in entering the contempt order against Father, without

4. That statement of attorney's fees and costs was in the amount of $4,500.00.

Father having an opportunity to be heard on the reasonableness of the attorney's fees and costs.[5] However, the district court then appears to have decided that no hearing was necessary and that it intended what it had ordered because it did not want the attorneys to "mess around and change what I've done" under the guise of W.R.C.P. 58.[6] Father also challenged the order appointing the guardian ad litem, and the district court agreed to reconsider that order. At this point in these proceedings, Mother's counsel announced that Mother was "throwing in the towel," and that she did not want to further contest Father's custody of Aurora. At the close of these proceedings, the district court stated that it would hold an additional hearing to decide the reasonableness of attorney's fees, costs, and child support. The record on appeal does not reflect that such a hearing was conducted.

## STANDARD OF REVIEW

[¶ 13] The only issue presented for our review is whether the alleged ex parte[7] con-

5. Of course, the initial burden is for Mother to have shown the reasonableness of her attorney's fees and costs and only then for the burden of persuasion to shift to Father to present evidence to the contrary.

6.

RULE 58. ENTRY OF JUDGMENT OR ORDER

(a) Presentation. Subject to the provisions of Rule 55(b) and unless otherwise ordered by the court, written judgments or orders shall be presented to the court within 20 days after its decision is made known. Before submitting the judgment or order, the party drafting it shall seek to secure the written approval as to form of the other parties. If, within 10 days, approval as to form is not obtained, the party drafting the form of judgment or order may forward the original to the court and serve a copy on the other parties with a notice advising objections must be made within 10 days. If no written objection is timely filed, the court may sign the judgment or order. If objection is filed, the court will resolve the matter with or without a hearing. A party objecting shall submit an alternative form of judgment or order with the objection.

(b) Form of Entry. Subject to the provisions of Rule 54(b), in all cases, the judge shall promptly settle or approve the form of the judgment or order and direct that it be entered by the clerk. Every judgment shall be set forth on a separate document, shall be identified as such, and may include findings of fact and conclusions of law. The names of all parties shall be set out in the caption of all final orders, judgments and decrees. All judgments and orders must be entered on the journal of the court and specify clearly the relief granted or order made in the action.

(c) Time of Entry. A judgment or final order shall be deemed to be entered whenever a form of such judgment or final order, signed by the trial judge, is filed in the office of the clerk of the court in which the case is pending. Entry of the judgment shall not be delayed, nor the time for appeal extended, in order to tax costs or award fees, except that, when a timely motion for attorney's fees is made under Rule

54(d)(2), the court, before the appellate court acquires jurisdiction, may order that the motion have the same effect on the time for appeal for all parties as a timely motion under Rule 59.

7. The argument propounded by Father focuses on Canon 3 of the Code of Judicial Conduct, which we include here for its instructive value.

**Canon 3. A Judge Shall Perform the Duties of Judicial Office Impartially and Diligently.**

A. *Judicial Duties in General.*—The judicial duties of a judge take precedence over all the judge's other activities. The judge's judicial duties include all the duties of the judge's office prescribed by law. In the performance of these duties, the following standards apply.

B. *Adjudicative Responsibilities.*

(1) A judge shall hear and decide matters assigned to the judge except those in which disqualification is required.

(2) A judge should be faithful to the law and maintain professional competence in it. A judge shall not be swayed by partisan interests, public clamor or fear of criticism.

(3) A judge shall require order and decorum in proceedings before the judge.

(4) A judge shall be patient, dignified and courteous to litigants, jurors, witnesses, lawyers and others with whom the judge deals in an official capacity, and shall require similar conduct of lawyers, and of staff, court officials and others subject to the judge's direction and control.

*Commentary.*—*The duty to hear all proceedings fairly and with patience is not inconsistent with the duty to dispose promptly of the business of the court. Judges can be efficient and businesslike while being patient and deliberate.*

(5) A judge shall perform judicial duties without bias or prejudice. A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, including but not limited to bias or prejudice based upon race, sex, religion, national origin, disability, age, sexual orientation or socioeconomic status, and shall not permit staff, court officials and others subject to the judge's direction and control to do so.

Commentary.—*A judge must refrain from speech, gestures or other conduct that could reasonably be perceived as sexual harassment and must require the same standard of conduct of others subject to the judge's direction and control.*

*A judge must perform judicial duties impartially and fairly. A judge who manifests bias on any basis in a proceeding impairs the fairness of the proceeding and brings the judiciary into disrepute. Facial expression and body language, in addition to oral communication, can give to parties or lawyers in the proceeding, jurors, the media and others an appearance of judicial bias. A judge must be alert to avoid behavior that may be perceived as prejudicial.*

(6) A judge shall require lawyers in proceedings before the judge to refrain from manifesting, by words or conduct, bias or prejudice based upon race, sex, religion, national origin, disability, age, sexual orientation or socioeconomic status, against parties, witnesses, counsel or others. This Section 3B(6) does not preclude legitimate advocacy when race, sex, religion, national origin, disability, age, sexual orientation or socioeconomic status, or other similar factors, are issues in the proceeding.

*(7) A judge shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law. A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding except that:*

*(a) Where circumstances require, ex parte communications for scheduling, administrative purposes or emergencies that do not deal with substantive matters or issues on the merits are authorized; provided:*

*(i) the judge reasonably believes that no party will gain a procedural or tactical advantage as a result of the ex parte communication, and*

*(ii) the judge makes provision promptly to notify all other parties of the substance of the ex parte communication and allows an opportunity to respond.*

*(b) A judge may obtain the advice of a disinterested expert on the law applicable to a proceeding before the judge if the judge gives notice to the parties of the person consulted and the substance of the advice, and affords the parties reasonable opportunity to respond.*

*(c) A judge may consult with court personnel whose function is to aid the judge in carrying out the judge's adjudicative responsibilities or with other judges.*

*(d) A judge may, with the consent of the parties, confer separately with the parties and their lawyers in an effort to mediate or settle matters pending before the judge.*

*(e) A judge may initiate or consider any ex parte communications when expressly authorized by law to do so.*

Commentary.—*The proscription against communications concerning a proceeding includes communications from lawyers, law teachers, and other persons who are not participants in the proceeding, except to the limited extent permitted.*

*To the extent reasonably possible, all parties or their lawyers shall be included in communications with a judge.*

*Whenever presence of a party or notice to a party is required by Section 3B(7), it is the party's lawyer or, if the party is unrepresented, the party who is to be present or to whom notice is to be given.*

*An appropriate and often desirable procedure for a court to obtain the advice of a disinterested expert on legal issues is to invite the expert to file a brief amicus curiae.*

*Certain ex parte communication is approved by Section 3B(7) to facilitate scheduling and other administrative purposes and to accommodate emergencies. In general, however, a judge must discourage ex parte communication and allow it only if all the criteria stated in Section 3B(7) are clearly met. A judge must disclose to all parties all ex parte communications described in Sections 3B(7)(a) and 3B(7)(b) regarding a proceeding pending or impending before the judge.*

*A judge must not independently investigate facts in a case and must consider only the evidence presented.*

*A judge may request a party to submit proposed findings of fact and conclusions of law, so long as the other parties are apprised of the request and are given an opportunity to respond to the proposed findings and conclusions.*

*A judge must make reasonable efforts, including the provision of appropriate supervision, to ensure that Section 3B(7) is not violated through law clerks or other personnel on the judge's staff.*

*If communication between the trial judge and the appellate court with respect to a proceeding is permitted, a copy of any written communication or the substance of any oral communication should be provided to all parties.*

(8) A judge shall dispose of all judicial matters promptly, efficiently and fairly.

Commentary.—*In disposing of matters promptly, efficiently and fairly, a judge must demonstrate due regard for the rights of the parties to be heard and to have issues resolved without unnecessary cost or delay. Containing costs while preserving fundamental rights of parties also protects the interests of witnesses and the general public. A judge should monitor and supervise cases so as to reduce or eliminate dilatory practices, avoidable delays and unnecessary costs. A judge should encourage and seek to facilitate settlement, but parties should not feel coerced into surrendering the right to have their controversy resolved by the courts.*

*Prompt disposition of the court's business requires a judge to devote adequate time to judicial duties, to be punctual in attending court and expeditious in determining matters under*

submission, and to insist that court officials, litigants and their lawyers cooperate with the judge to that end.

(9) A judge shall not, while a proceeding is pending or impending in any court, make any public comment that might reasonably be expected to affect its outcome or impair its fairness or make any nonpublic comment that might substantially interfere with a fair trial or hearing. The judge shall require similar abstention on the part of court personnel subject to the judge's direction and control. This Section does not prohibit judges from making public statements in the course of their official duties or from explaining for public information the procedures of the court. This Section does not apply to proceedings in which the judge is a litigant in a personal capacity.

*Commentary.—The requirement that judges abstain from public comment regarding a pending or impending proceeding continues during any appellate process and until final disposition. This Section does not prohibit a judge from commenting on proceedings in which the judge is a litigant in a personal capacity, but in cases such as a writ of mandamus where the judge is a litigant in an official capacity, the judge must not comment publicly. The conduct of lawyers relating to trial publicity is governed by Rule 3.6 of the Wyoming Rules of Professional Conduct.*

(10) A judge shall not commend or criticize jurors for their verdict other than in a court order or opinion in a proceeding, but may express appreciation to jurors for their service to the judicial system and the community.

*Commentary.—Commending or criticizing jurors for their verdict may imply a judicial expectation in future cases and may impair a juror's ability to be fair and impartial in a subsequent case.*

(11) A judge shall not disclose or use, for any purpose unrelated to judicial duties, nonpublic information acquired in a judicial capacity.

C. *Administrative Responsibilities—.*

(1) A judge shall diligently discharge the judge's administrative responsibilities without bias or prejudice and maintain professional competence in judicial administration, and should cooperate with other judges and court officials in the administration of court business.

(2) A judge shall require staff, court officials and others subject to the judge's direction and control to observe the standards of fidelity and diligence that apply to the judge and to refrain from manifesting bias or prejudice in the performance of their official duties.

(3) A judge with supervisory authority for the judicial performance of other judges shall take reasonable measures to assure the prompt disposition of matters before them and the proper performance of their other judicial responsibilities.

(4) A judge shall not make unnecessary appointments. A judge shall exercise the power of appointment impartially and on the basis of merit. A judge shall avoid nepotism and favoritism. A judge shall not approve compensation of appointees beyond the fair value of services rendered.

*Commentary.—Appointees of a judge include assigned counsel, officials such as referees, commissioners, special masters, receivers and guardians and personnel such as clerks, secretaries and bailiffs. Consent by the parties to an appointment or an award of compensation does not relieve the judge of the obligation prescribed by Section 3C(4).*

D. *Disciplinary Responsibilities.—*

(1) A judge who receives information indicating a substantial likelihood that another judge has committed a violation of this Code should take appropriate action. A judge having knowledge that another judge has committed a violation of this Code that raises a substantial question as to the other judge's fitness for office shall inform the appropriate authority.

(2) A judge who receives information indicating a substantial likelihood that a lawyer has committed a violation of the Rules of Professional Conduct should take appropriate action. A judge having knowledge that a lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects shall inform the appropriate authority.

(3) Acts of a judge, in the discharge of disciplinary responsibilities, required or permitted by Sections 3D(1) and 3D(2) are part of a judge's judicial duties and shall be absolutely privileged, and no civil action predicated thereon may be instituted against the judge.

*Commentary.—Appropriate action may include direct communication with the judge or lawyer who has committed the violation, other than direct action if available, and reporting the violation to the appropriate authority or other agency or body.*

E. *Disqualification.—*

(1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:

*Commentary.—Under this rule, a judge is disqualified whenever the judge's impartiality might reasonably be questioned, regardless whether any of the specific rules in Section 3E(1) apply. For example, if a judge were in the process of negotiating for employment with a law firm, the judge would be disqualified from any matters in which that law firm appeared, unless the disqualification was waived by the parties after disclosure by the judge.*

*A judge should disclose on the record information that the judge believes the parties or their lawyers might consider relevant to the question of disqualification, even if the judge believes there is no real basis for disqualification.*

*By decisional law, the rule of necessity may override the rule of disqualification. For exam-*

tact between Mother's attorney and the district court so tainted the proceedings below that reversal of the district court's various orders is required.

[¶ 14] In *Coletti v. State*, 769 P.2d 361, 362 (Wyo.1989), we held that merely because an ex parte contact might be censurable, it does not automatically require reversal and remand. *Also see Lund v. Lund*, 849 P.2d 731, 734–37 (Wyo.1993). In *Coletti*, it was established that the district court had received an ex parte communication from a deputy sheriff containing information that was designed to supplement an incomplete presentence report. However, in that case we gave recognition to the rule that where a matter is tried to the court sitting without a jury, as well as in a circumstance where the court is pronouncing sentence, a presumption exists that the court will not be misled or confused by what is irrelevant and is able to eliminate that which is immaterial from that which properly may be considered. *Coletti*, 769 P.2d at 363. In addition, in *Coletti* we took into account the fact that the district court categorically disavowed that any use

---

ple, a judge might be required to participate in judicial review of a judicial salary statute, or might be the only judge available in a matter requiring immediate judicial action, such as a hearing on probable cause or a temporary restraining order. In the latter case, the judge must disclose on the record the basis for possible disqualification and use reasonable efforts to transfer the matter to another judge as soon as practicable.

(a) the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding;

(b) the judge served as a lawyer in the matter in controversy, or a lawyer with whom the judge previously practiced law served during such association as a lawyer concerning the matter, or the judge had been a material witness concerning it;

*Commentary.—A lawyer in a government agency does not ordinarily have an association with other lawyers employed by that agency within the meaning of Section 3E(1)(b); a judge formerly employed by a government agency, however, should disqualify himself or herself in a proceeding if the judge's impartiality might reasonably be questioned because of such association.*

(c) the judge knows that he or she, individually or as a fiduciary, or the judge's spouse, parent or child wherever residing, or any other member of the judge's family residing in the judge's household, has an economic interest in the subject matter in controversy or in a party to the proceeding or has any other more than de minimis interest that could be substantially affected by the proceeding;

(d) the judge or the judge's spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(i) is a party to the proceeding, or an officer, director or trustee of a party;

(ii) is acting as a lawyer in the proceeding;

(iii) is known by the judge to have a more than de minimis interest that could be substantially affected by the proceeding;

(iv) is to the judge's knowledge likely to be a material witness in the proceeding.

*Commentary.—The fact that a lawyer in a proceeding is affiliated with a law firm with which a relative of the judge is affiliated does not of itself disqualify the judge. Under appropriate circumstances, the fact that "the judge's impartiality might reasonably be questioned" under Section 3E(1), or that the relative is known by the judge to have an interest in the law firm that could be "substantially affected by the outcome of the proceeding" under Section 3E(1)(d)(iii) may require the judge's disqualification.*

(2) A judge shall keep informed about the judge's personal and fiduciary economic interests, and make a reasonable effort to keep informed about the personal economic interests of the judge's spouse and minor children residing in the judge's household.

F. *Remittal of Disqualification.* A judge disqualified by the terms of Section 3E may disclose on the record the basis of the judge's disqualification and may ask the parties and their lawyers to consider, out of the presence of the judge, whether to waive disqualification. If following disclosure of any basis for disqualification other than personal bias or prejudice concerning a party, the parties and lawyers, without participation by the judge, all agree that the judge should not be disqualified, and the judge is then willing to participate, the judge may participate in the proceeding. The agreement shall be incorporated in the record of the proceeding.

*Commentary.—A remittal procedure provides the parties an opportunity to proceed without delay if they wish to waive the disqualification. To assure that consideration of the question of remittal is made independently of the judge, a judge must not solicit, seek or hear comment on possible remittal or waiver of the disqualification unless the lawyers jointly propose remittal after consultation as provided in the rule. A party may act through counsel if counsel represents on the record that the party has been consulted and consents. As a practical matter, a judge may wish to have all parties and their lawyers sign the remittal agreement.*

(Emphasis added.) (Footnotes omitted.)

had been made of the ex parte communication. *Id.* Here, the district court disavowed ever having seen the letter upon which this claim focuses.

[¶ 15] In a case where a guardian ad litem had ex parte contact with a district court, and we determined that it constituted an ethical impropriety, we held that reversal of a judgment required more than simply the occurrence of the ex parte communication. *Moore v. Moore,* 809 P.2d 261, 264 (Wyo. 1991). In that case, we espoused the rule that in order to lead to the reversal of a judgment in such an instance, a manifest injustice must appear. Further, in order to evaluate the presence of a manifest injustice, we look to the totality of the circumstances.

[¶ 16] Father offers another standard of review to this effect: "The standard of review when a trial judge's impropriety is questioned is whether the judge engaged in conduct which would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired." Although we clearly perceive that this "standard" has no relevance to our inquiry, we note that no cogent argument or pertinent authority accompanies this suggestion, and we will not consider it in our analysis. *McLoughlin v. McLoughlin,* 996 P.2d 5, 8–9 (Wyo.2000).

## DISCUSSION

[¶ 17] In this case, except for Father being found to be in contempt of court and punished by the attorney's fees and costs award, he received all relief he requested. The district court's oral determination that Father was in contempt and that an award of attorney's fees and costs would punish him was made before the alleged ex parte communication occurred. Moreover, facially there is no question but that Father did disobey the district court's custody order. Finally, the district court specifically stated that it did not see the letter that forms the centerpiece of the alleged ex parte communication. Under these circumstances, we conclude no manifest injustice has occurred.

[¶ 18] Implicitly, Father asks us to perform a task that is generally assigned to the Commission on Judicial Conduct and Ethics (CJCE). Wyo. Const., art. 5, § 6. Another portion of the Father's contentions is addressed to a matter that is generally assigned to the Board of Professional Responsibility (BPR). Although we do not disavow that our authority and responsibilities may include, if circumstances warrant, the power to discipline a judicial officer without reference to the functions of the CJCE, or an attorney without reference to the BPR, this is not such a case. Likewise, this Court exercises superintending authority over the Wyoming State Bar and the attorneys who are members of that Bar. Wyo. Stat. Ann. § 5–2–118 (LexisNexis 2001). The body to which a complaint as to the conduct of an attorney is filed is the BPR. If a party wishes to submit a complaint to either the CJCE or the BPR, that party may do so.

[¶ 19] Mother contends that this appeal should be dismissed for failure of Father to have filed a notice of appeal within 30 days of the entry of the order holding Father in contempt and imposing a punishment therefor. While Father might well have attempted to appeal that order on an interlocutory basis, or on the basis that it was an order described in W.R.A.P. 1.05(b), we conclude that the order was also subsumed into the district court's final order of October 6, 2000, and thus the appeal was timely.

[¶ 20] Mother asks that we impose monetary sanctions against Father's attorney, and in favor of Mother, under W.R.A.P 1.03 because Father's brief was, in many respects, not in conformance with the W.R.A.P. and also that we impose monetary sanctions in favor of Mother under W.R.A.P. 10.05. We are not convinced that sanctions are appropriate under the circumstances of this case, and we decline to impose any of the sanctions requested by Mother.

## CONCLUSION

[¶ 21] Having resolved the issues raised in this appeal, we hold that the judgment and

orders of the district court should be affirmed.